Good morning, everyone. We're here today for oral arguments. We're going to begin with three cases, 23-3310, 24-1273, and 24-1289, Federal Trade Commission v. Day Pacer LLC and Margaret Cummings. We're going to begin with oral argument from Mr. Gonsalves. Good morning, Your Honors. Good morning. It may please the court, counsel, co-counsel. We are here today to talk about whether or not the corporate defendants violated the telemarketing sales rule. The specific provision at issue was found at 16 CFR 3104 B.1.3. And that provision says that a telemarketer is prohibited from initiating an outbound telephone call to individuals on the Do Not Call Registry who have opted out of receiving telephone calls that induce the purchase of goods or services. The district court ruled that the definition of a telemarketer or definition of telemarketing does not require that the sale or the inducement for the sale of the goods or services does not need to be included in the telephone call made by the telemarketer. It is my view that that is error. The court focused on the definition of telemarketing and the definition of a telemarketer. In 310.2 GG and 310.2 HH. That provision of the telemarketing sales rule was amended in April of this year. And so in some of the briefing, you might see references to FF and GG instead of GG and HH, but it didn't change the definition at all. The definition of a telemarketer, it is a person who in connection with telemarketing initiates telephone calls. Telemarketing is a planned program or campaign that involves one or more telephones that induces the purchase of goods or services. But engaging in telemarketing or being a telemarketer is not prohibited by the telemarketing sales rule. There's only two types of telephone calls or two types of telemarketing that is prohibited. That is deceptive telemarketing and abusive telemarketing. The provision that we are focusing on is abusive telemarketing in B.1.3.B. And that requires first that you must be a telemarketer and two, that you initiate an outbound telephone call to an individual whose number is on the do not call list. The definition of an outbound telephone call is a telephone call initiated by a telemarketer that induces the purchase of goods or services. And it seems to me that the plain language and the definition of this outbound telephone call requires that the call made by the telemarketer include the inducement to purchase goods and  The district court concluded otherwise and in her conclusion she didn't cite any authority for that outcome. The district court also concluded that the planned program or campaign that is in the of more than one company even though they are independent of each other and have no relations with each other. Here the district court concluded that the planned program or campaign was the result of the conduct by the corporate defendants as well as by the colleges and universities that purchased the consumer data. There's no allegation in the complaint that there is an agency relationship between the defendants and these colleges and universities. There was an allegation of agency between the corporate defendants and these inbound transfer partners, these call centers that was talked about in the case. The district court concluded that the Federal Trade Commission failed to prove that agency relationship. But there wasn't any allegation of an agency relationship with the colleges and universities. The FTC alleged that the corporate defendants provided substantial assistance to these IBT partners, these inbound transfer partners. They did not make a similar allegation with respect to these colleges and universities. They are completely independent of each other. One's a buyer and one's a seller and nothing more. And I don't believe that the facts support that there is a relationship between these two companies either. One of the pieces of testimony that the FTC may cite to is the testimony of David Cummings. And he said, the goal of the two call center companies was to sell leads. The conversion of those leads into the sale of the educational services was relevant but not essential. It was not an important business metric. In other words, the plan, program, or campaign of the corporate defendants, if there was one, was to collect consumer information and sell that information to the colleges and universities and that's where their interest ended. What happened to that consumer information afterwards was not part of their plan, program, or campaign. The district court and the FTC say that the telemarketing sales rule is analogous to the Telephone Consumer Protection Act, the TCPA. What material differences do you see between those, material to this dispute? I think that the provisions of telemarketing under the TCPA and the provisions of telemarketing under the TSR are analogous. I don't see material differences. And we cited seven cases in our brief where telephone calls that did not induce the purchase of goods or services was found not to be telemarketing under the TCPA. The FTC says those cases are not relevant because they're not lead generation cases. The only case they cite for their proposition that the call does not need to include the inducement of the purchase of goods or services is Golan versus Veritas. But that case is easily distinguishable. In that case, the marketing company had two phone calls that it was placing to consumers. If the consumer answered the telephone, they received the advertisement, the message that said, please come see our movie. If they didn't answer the telephone, they received a very short voicemail. And that's the voicemail that the plaintiffs in that particular case received. The defendants argued there was no telemarketing on that particular call and the court concluded, no, but your overall plan between these two telephone calls was to induce the purchase of services, in that case, a movie. We cited two additional cases in our reprieve, and one of them is about a lead generation company, and that is Pepper versus GBG Capital. And in that case, the lead generation company, this company that was collecting consumer data, was a real estate company. And the court in that case said the collection of consumer data is not telemarketing because it does not include the inducement to purchase goods or services. Counsel, some of that goes to whether or not you meet the definition of telemarketer. In the proceedings below, were you focused on FTC not showing that Daypacer was a telemarketer, or were you arguing to the district court that if you were a telemarketer, you still weren't a telemarketer making outbound calls? I think in the proceedings below, we were arguing we were not making the outbound calls as defined under the TSR, that our telephone calls did not include the inducement to purchase goods or services. And we think that that is a necessary element to satisfy the, to meet the elements of the TSR that we're focused on in 310.4b.1.3. So we think it is error for the court to have concluded that the calls need not include the inducement to purchase goods or services, and we think it is error that the court can link the conduct of two independent companies together to satisfy the planned program campaign portion of the definition of telemarketing. Let's assume we don't agree with you, and so then we do get to the issue of penalties. Can you shift to penalties before you reserve your time for rebuttal? Yes, I will. And if the court disagrees with me, the question then is, was it appropriate to find the corporate defendants and the individual defendants liable? Did they have the knowledge or the knowledge fairly implied that the conduct at issue violated the telemarketing sales rule? The corporate defendants and the individual defendants testified in declarations that they understood the requirement to be that their telephone calls had to include the inducement to purchase goods or services. The FTC and the district court point to other evidence. They say some of your contracts included references to the TCPA and the TSR, so you must have known of its existence. You received complaints from consumers. There were about 20 complaints from consumers, and there was even a couple of lawsuits that all focused on the Telephone Consumer Protection Act. So you must have known that the TCPA and the TSR existed, but the requirement is more than that. In fact, the requirement is that you not only knew of the existence of the rule, you have to know that your conduct, or that the knowledge is fairly implied, that the conduct at issue actually violates the telemarketing sales rules. Our declaration said we did not understand that it did so because our calls didn't include the inducement to purchase goods and services, and therefore we are outside of the realm of the telemarketing sales rule. Do you want to save some time for rebuttal? I do. Thank you very much. Thank you, Mr. Goncalves. We'll now move for oral argument from Mr. Douglas. Good morning, Your Honors. May it please the Court. My name is Richard Douglas. I'm here on behalf of Margaret Cumming, personal representative of the estate of David Cumming, and I'm planning today to discuss the substitution ruling and a little bit about the civil penalties if I have time. Regarding the substitution ruling, for that I'm going to look to this Court's Smith test, which is a three-factor test that everyone agrees applies. The district court below found that one factor favored abatement, whereas two of them factored not abatement and survival. We think all three factors lean penal, and so it should be reversed. It strikes me that the third factor is really the proportionality issue where there's a big debate here. Is there any aspect in Smith, and I'm specifically referencing the key paragraph where the three factors are listed. The third factor is listed where the authorized recovery is wholly disproportionate to the harm suffered. Correct. Cites Murphy. You go to Murphy, the formulation is slightly different in Murphy. It reverses the wording. You go back further into the old Supreme Court cases, the wording is even different there. We're tracing this chain of the test, right, all the way back. Is there any aspect of changes in the wording that you think impacts that third element? On factor three? Yes. I mean, I think that the key word there is the authorized recovery. I think that is the key language that was relied upon, excuse me, stated in Smith, and when you look at what an authorized recovery is, there really is only one number as far as we can tell, and that is the number that the statute says is the authorized amount you could seek, and that's where we think the district court erred was by departing from that number and relying on Parchman saying that because there was discretion, it could look at only what the FTC was seeking. I don't believe Parchman said that. It was only saying that, actually in Parchman, it did use the authorized recovery. It used the $500 and $1,500 per call and found that that was disproportionate. I would submit that the $40,000 here that's authorized is even more disproportionate. So that's the language, I think, on factor three that was essential to the test that we're arguing today. There was also a change in factor one that the Smith court made from the Murphy court, which was to change the language from the statute to the action, and then saying that for factor one, you look to whether the purpose of the action is to redress individual wrongs or wrongs to the public, as opposed to the statute, and what we saw here is that the court looked at the statute and it analogized the TSR to the TCPA and other consumer protection statutes, and based on that overarching view, rule of factor one was leaned in favor of remediality. Other than Smith, Murphy, Huntington, we looked, is there any other case law, Parchman, obviously, any other cases that we should be aware of that speak to this determination? So I think that the old cases that Your Honor was referencing, for example, the Shriver case, which was cited by the FTC, and we amplified that in our reply, it sets forth this early notion that you're focused on the action. You can't necessarily say it's a Smith factor one, two, three test, because it predates Smith by a hundred years, but it definitely focuses on more than just the overall purpose of the statute. So while overall purpose of the statute is something you would look at, and in some cases it might be determinative on factor one, where it's not, where you have a mixed-use statute, you need to look at something more, and I think the Smith court said exactly what that should be, and that's very consistent with Shriver. The only other factor on the Smith test is factor two, which everyone agrees goes in our favor, so I will move on past that. Unless Your Honor, unless the court has other questions on the substitution point, I'll move on to the civil penalties, and there I'd like to make two points regarding the civil penalties. The first one is that the court applied joint and several liability to the civil penalties, and in that way made everybody liable for everyone else's conduct, and we believe that that is not supported by any authority that was cited by the FTC or the district court, and runs contrary to this, the notion that is in the statute itself that these determinations have to be done individually. So for that reason, we believe applying joint and several is inconsistent with the statute, and so was an error, an abuse of discretion on that point. And then the last point I want to make on the civil penalty factors before my time expires is the civil penalty factors were not actually used. The court's summary judgment opinion at A58 in our appendix lists them and then goes through what the FTC was seeking, but then didn't actually go back and apply them in that opinion. Instead the court asked for more briefing, and then in that, but then when we gave the court the additional briefing, the court at A64 of our appendix said we've already applied the penalty factors in our summary judgment opinion. So they actually... She also credits the FTC's evaluation of the factors. Why shouldn't we look at that, plus what she said in the summary judgment order, plus what she said elsewhere in this protracted manner of really looking at the issue, getting input from the parties, and why can't we look at the total picture and see her as analyzing all of those factors? Well, I mean, I think you can look at the total picture and seeing that she had agreed generally that the FTC had made positions on those factors, but then she didn't analyze the responses that we put in at her request in the civil penalties ruling, instead saying that they had already been done. So from our perspective, the factors were listed, but then not actually used, and what you end up with is a penalty that doesn't line up, it doesn't fit the factors. There's most obviously ability to pay. No one can pay this penalty. It's twice what the estate can pay. It's over 30 times what Mr. Ian Fitzgerald could pay. So by listing the factors and then not actually taking the time to do the analysis, at least that's my view, that's an abuse of discretion that needs to be vacated. Thank you, Mr. Douglas. You'll reserve the remainder of your time. Thank you. We'll now move Mr. Hagedis to you. Good morning, Your Honors. Mark Hagedis for the Federal Trade Commission. May it please the Court. The District Court found that Dave Pacer was responsible for at least 4.1 million calls to consumers. Those numbers were on the Do Not Call Registry. Dave Pacer used those calls to generate leads. It sold for telemarketing purposes, earning nearly $28.7 million over five years. David Cumming and the Fitzgeralds owned and managed Dave Pacer, and they benefited through their ownership of companies that supported its operations. We believe the District Court should be affirmed for four reasons. First, undisputed facts establish that Dave Pacer's calls to the numbers on the Do Not Call Registry violated the TSR. Second and third, the District Court did not abuse its discretion in holding the individual defendants liable for civil penalties and in joining Dave Pacer and the Fitzgeralds from telemarketing. And fourth, the District Court properly substituted, as a defendant, the Cumming estate. At the outset, Your Honor, I'd like to address some of the points that counsel for the other side raised. The first one regarded this case, Pepper v. GBG Capital, and it's clear from that case that those telemarketing or those phone calls involved purchases. The courts there rested their decision on the fact that those calls involved purchases and not sales of goods and services. With respect to the question of authorized recovery, to say that the FTC Act and the civil penalty provisions authorize only the maximum civil penalty looks at only half a  loaf. The full loaf is the maximum plus the required five factors. And the District Court here absolutely took into consideration the five factors, including by relying upon the FTC's own analysis of those five factors. Where do you see the District Court making findings on each of those 45M1C factors, particularly ability to pay and effect on business? Yes, Your Honor. So the District Court did not go into great detail with respect to its findings on each of the five factors. Rather, it made note of the fact that the FTC itself had analyzed those factors. With respect to the ability to pay and the effect on the business in particular, that was the subject of the supplemental briefing. The District Court, when it ruled on summary judgment, it concluded that it needed more information as to whether or not to assess civil penalties, the amount of the civil penalties, focused particularly on the information that might have changed from the time of the summary judgment briefing. And there the focus was on ability to pay and the effect on the business. And then when the court ruled following that supplemental briefing, it focused on those factors and rejected the attempt by the estate in particular to relitigate those factors that would not have changed from the summary judgment briefing, and in particular the factor of culpability as well as harm. What's your response to opposing counsel's point that where the court doesn't acknowledge their responses after she calls for the additional briefing, how do we have any confidence that the court did consider each of those factors? Your Honor, the court absolutely did acknowledge the responses. The court divided those responses into two categories. One, the court rejected the effort to relitigate facts that had been decided and would not have changed between the time of the summary judgment briefing and the ruling on the civil penalties, and specifically I'm referring to the actual conduct of Mr. Cumming, the actual conduct of the other defendants. That conduct had been established at the summary judgment briefing. The facts that the court took into consideration were facts that could have changed, such as the ability to pay and the effect on the business, as well as the estate's request that the court take into consideration the particulars of the estate. And there, the court concluded incorrectly, following this court's precedence, that the estate stepped into the shoes of Mr. Cumming, and so the state had to take the factual record as it found it and could not relitigate, as the court observed in its prior decision with respect to substitution and whether or not the state steps into the shoes of the substituted party, it would make a mess of litigation if the substituted party could go back and relitigate issues already decided. Another point I'd like to address, Your Honors, with respect to what my esteemed counsel on the other side talked about was this issue of whether or not one focuses on the action or whether one focuses on the statute and the purposes. And we believe that whether you focus on the purpose of the action or the purpose of the statute, the first factor under Smith points in the direction of substitution, in that the civil penalties here in the court found below that the civil penalties here work to redress harm to individuals. And that comes from the recognition that the harm from these unwanted phone calls is felt by individuals. It interrupts their meals. It distracts them. This court in the patriotic veterans case recognized that as well, that individuals are harmed. This is the problem, though, with sometimes relying on congressional findings, because frankly, it could go either way, right? It could be for the public. It could be for the individual. Parchment doesn't help us that much. I'm just not sure how much work that first purpose factor can do here. Your response? Yes. Yes, Your Honor. And I think the court in the Smith decision recognized that that first factor can have aspects that point towards remedying harm to the public, can have other aspects that point to remedying harms to individuals. And I think there's an important analogy between the Smith case and this case. One of the facts that the court in Smith found relevant was that the disclosures there under the Truth in Lending Act helped to empower consumers so that they could make their own decisions about the terms and conditions of credit. Similarly here, the Do Not Call Registry empowers consumers to make their own decisions about whether or not they want to receive these kinds of phone calls. And so in that respect, the focus on harms to individuals is very similar between Smith and this case. And let me get back to the TSR for a second. The definition of telemarketer includes plan, program, or campaign. We don't see that in the definition of outbound call. There's no dispute, I think, that the particular outbound calls that Day-Pacer made didn't in and of themselves, without additional planned calls down the road, induce the sale or purchase of any goods or services. How are you reading the definition of outbound call to include Day-Pacer's activities? Your Honor, I think it requires some artifice to say that the calls that Day-Pacer made were not the first step in a sale or a campaign to sell. To sell, you have to make the opening sell, though. That's exactly what Day-Pacer was doing here. It was calling consumers whose names were on the Do Not Call Registry and asking them questions to gauge their interest in these educational products. It's as though a consumer walks into—or actually, I should think about it. Someone comes up to you on the street and starts asking you questions about your interests, and then with the goal of eventually perhaps selling you a product, the sale pitch starts with that initial contact. We have other examples, for example, where the FTC deems this telemarketing, parties that engage in this kind of lead generation without necessarily having any particular product in mind. They simply then post those leads out for sale to companies that want to call those consumers, but there's no particular requirement that it be tied to the sale of a particular product. So ground that for me, if you will, in the definition of the outbound telephone call being initiated by a telemarketer to induce the purchase of goods or services. Yes, Your Honor. I mean, the outbound telephone call here was part of this plan to identify consumers who might be interested in these educational products. As I said, to try to separate out that initial phone call, that opening bid, that opening pitch from what was being sold, and in this case, Day Patient was very clear that it was engaged in this lead generation in order to, they had contracts with these education companies. Then why wouldn't the FTC have put the same language in the definition of outbound call that it did in the definition of telemarketer and include in the definition of outbound call a plan or a program to induce the sale or purchase? Your Honor, I don't have an answer to that question. I would be happy to go back and obtain that information from my colleagues who were responsible for the TSR and provide supplemental briefing on that point, but I don't have an answer, Your Honor. Do you agree that it creates some ambiguity? Yes, Your Honor. Okay. Well, while we're on the subject of the TSR, does the record show that anybody other than Cumming actually looked at it, and if not, how is it one can say for the other defendants they have knowledge or fairly implied knowledge if they were told by Cumming that the TSR did not apply to Day Pacers' activities? Your Honor, the knowledge is satisfied here in a number of respects. Number one, we have to look at the fact that we're talking about the owners, the managing members of these companies. Mr. Raymond Fitzgerald held that position. Mr. Cumming held that position. From the outset, EduTrac, which later became Day Pacer, entered into contracts with the education companies, and in those contracts, and these are the education companies that actually were pitching, making the calls for trying to sell the education products. Those contracts required that Day Pacer or EduTrac comply with the TSR. It specifically identified the TSR. So going back to the period of, say, 2014, the contracts that EduTrac entered into specifically required compliance with the TSR. At the same time, EduTrac was entering into contracts with its IBT partners where it was requiring its IBT partners to also comply with the TSR. So this idea that somehow the TSR was out there and Day Pacer and its owners and its managers didn't think it applied to it is contradicted by the actual evidentiary record, which shows that Day Pacer itself, EduTrac itself, was undertaking obligations to comply with the TSR. In addition, the district court found that the defendants in their affidavit said, yes, oh, we understood the TCPA to apply to us, but we didn't think the TSR applied to us. And the district court found that that was not objectively reasonable given the similarities between the TCPA and the TSR. The two both rely upon the Do Not Call Registry. They impose similar requirements. In fact, Congress required that the TCPA align with the TSR. Is the answer to my initial question, does the record show that anyone other than Cumming looked at it? Is that answer no? Your Honor, there's no evidence in the record that Mr. Fitzgerald, for example, opened up the rule book and looked at the TSR. However, Mr. Cumming sent an email to Raymond and Ian Fitzgerald saying, you need to take a look at this. So Mr. Cumming was aware. He tried to make his partners aware of the requirements of the TSR. And certainly the record supports that. The actual documentary record that provides support for the district court's conclusions that here there wasn't any dispute about the partners of Mr. Cummings and the Fitzgerald knowledge about the TSR. One other issue with respect to the Schreiber case that counsel on the other side mentioned is the fact that if you look at that Schreiber case, the court focuses on what they call the penal statute, an action under a penal statute. And I think that lends support to this idea that you really can't separate out a purpose of an action from a purpose of a statute. These are going to be interrelated ideas. In order to understand the purpose of an action, it necessarily requires taking a look at the  It may be why the third factor, the authorized, what authorized means become so important for that analysis, right? I agree, Your Honor. And in this case, the authorized factor points towards a remedial or points to allowing substitution in the following way. While the FTC Act has maximums with respect to civil penalties, it also requires an examination of these five factors. And here, the district court adopted a civil penalty that is far below the maximums. And so the district court used its discretion to set a civil penalty that reflects the facts of the case. And so one of the things that the Sixth Circuit recognized in the Parchman decision is that where a district court is exercising its discretion in this way, that suggests that it is serving a remedial purpose, that it is attempting to address the harm found by the court based upon the facts of the case. But because it has the ability to lower the award below the maximum, that doesn't mean it always will, correct? That is correct, Your Honor. Here, however, the award is very much below the maximum. And when you take a look at the award on a per-call basis, $6.88, it shows that it is not at all disproportionate to the harms that are caused by these phone calls. Again, pointing to the Parchman decision, there the Sixth Circuit suggests that $500 was not disproportionate, $500 per call. Here, we're talking about a phone call, excuse me, a civil penalty set at $6.88 per phone call, so far below $500. And while the other side does talk about the fact that there is not concrete numbers, quantifications of the harm, it is well recognized by courts that these kinds of harms are hard to quantify. But it is undeniable that there is harm here. There is harm from the fact of being interrupted. Can we talk about some of the specifics? Do you agree that the district found only liability in terms of, I want to look at the transferred calls, only from Blue Water, it looks like. Yes, Your Honor. Should we be concerned about that? No, Your Honor. So the Blue Water call transfers provided the basis for finding that the defendants here violated the substantial assistance provisions of the telemarketing sales rule. And with respect to determining the per-call penalty, the district court looked at the calls that were transferred, and that could be documented as having been transferred from IBT partners to Daypacer, and it worked out to be about nearly 500,000 calls. That was added to the calls that Daypacer made itself to come up with the 4.1 million calls that served as the denominator to determine the per-call penalty. But with respect to the statements in the district court decision regarding the not finding of liability with respect to a bunch of other calls made by the IBT partners, that is referring to the fact that the IBT partners were responsible for nearly 40 million calls that were the result of the contracts that Daypacer entered into with the IBT partners. The district court, neither its injunction nor the civil penalty award accounted for those in its determinations. And so when the court says it did not, or the FTC did not seek to hold Daypacer liable, it is talking about not the Blue Water calls, but the nearly 40 million other calls that the IBT partners were making to consumers, some of whose names were on the Do Not Call registry, and for whom Daypacer did not have, excuse me, there was no indication of consent. Thank you, Mr. Haggadis. Thank you, Your Honors. Mr. Gonzalez, we'll move back to you and we're going to give you two minutes for a moment. Thank you, Your Honor. I'd like to address the individual defendant's culpability that was talked about a little bit. In order for them to be found individually liable and subject to the civil penalty, they must have had to participate directly in the deceptive acts or practices or had the authority to control them. I think here there is at least a genuine dispute as to whether or not, a genuine dispute as to the material facts. Counsel referenced that Raymond Fitzgerald was the managing member of the organization. That is true. He was a 50% owner in a family trust. That family trust owned a portion of the businesses. Typically, investors aren't liable for the conduct of a corporation. The evidence is that that family trust owned a real estate company and that real estate company leased its property to the companies. Typically, real estate realtors or landlords are not liable for the conduct of their tenants. Ian Fitzgerald at Adutrec for the first half of the period at issue, he was the Director of Human Resources. That is not a position that I would think would give rise to the authority to control the conduct at issue here. Is this June 2016 that he makes the change? June 2016 he makes the change, but prior to that he was not in a position that one would think would give him the authority to control the operations of the business. Did he send an email saying, I'm involved in the business? Yes, he did. But I think what that presents is a genuine issue of materials facts and such that summary judgment shouldn't have been awarded on that basis alone. With that, I rest here. Thank you very much, Mr. Gonsalves. Mr. Douglas, we'll move to you. Two minutes for rebuttal. Thank you, Your Honor. I just want to address a couple of points. One thing that Your Honor mentioned was, is there a distinction between the TSR and the TCPA? And I think that was a question. For purposes that Mr. Gonsalves was talking about, I think the answer is no. For purposes of survival, I think the answer is yes. And that is the remedial statutes that were found in Parchment and other cases to be overall remedial, they all had these private attorney general provisions. In fact, those were usually the provisions that were of concern were these private attorney general provisions. But all the courts that looked at those said, this actually promotes a remedial purpose to this because it causes private individuals to bring actions for their own claims. The TSR is the opposite of that. It has a $50,000 floor on what your damages can be, which substantially limits the ability of private individuals to come and go ahead and bring their own claims. So for that reason, I think on the issue of survival, it is decidedly more penal overall the TSR is than the TCPA or TILA. So I want to address that. One other point was made is that there is a stand in the shoes argument that is being made that changing things or allowing briefing would mess up the proceeding. Nothing was decided on summary judgment until after substitution. Substitution was decided before it, immediately before it in the order. All of these decisions were made after substitution. And so we are not talking about messing up the proceedings that had gone beyond prior. I would also like to mention that there were some mentions of the 2014 contracts. The record shows that Mr. Cummings said he was not involved in those contracts and there is no evidence as to when he ever saw them if he did. That is just a missing piece of the record. So the best evidence that the district court could find was that Mr. Cummings knew in about 2016. So for that reason, the 2014 and 2015 time period that we are using for civil penalties and for wrongfulness I think should be cut back to 2016. Thank you very much. Thank you Counsel for Appellant. Thank you Counsel for Appellee. The case will be taken under advisement.